In the Matter of the Application of JAMES A. LUNDY et al., Petitioners.

County Court, Queens County, October 3, 1955.

*Bernard Tompkins* for petitioners.

*T. Vincent Quinn, District Attorney* (*Lawrence Pierez* of counsel).

FARRELL, J. This is an application for an order expunging from the records of this court, a report returned by the Additional March, 1954, Grand Jury of the county upon its conclusion of an investigation into possible official corruption in the letting of the contracts for and the construction of a project referred to as the " Corridor Sewer " or the " Kissena Corridor Sewer " in the Borough and County of Queens.

From the said report it appears that on October 20, 1953, James A. Lundy, then (and now) President of the Borough of Queens (a governmental subdivision of the City of New York wholly within the County of Queens) issued a statement concerning the said Corridor Sewer, which had been contracted for and constructed before the commencement of Mr. Lundy's tenure as borough president. The substance of the statement was that Mr. Lundy, in the course of an official investigation

conducted in his capacity as borough president, had uncovered facts which (if true) would justify the conclusions that the contracts for the project had been let at grossly excessive prices, and that those concerned in the performance of, and the supervision of performance of the said contracts had been visibly less than faithful in the observance of their contractual and official obligations respectively. Moreover, (the statement continued) the substantial defects found were worsening at such a pace that a one-third-mile section was in imminent danger of collapse. For that reason (the statement went on) he was forthwith condemning that entire section, he was initiating action for its replacement, and would also forward the complete facts to the District Attorney and the (city) commissioner of investigation. The court accepts as fact the statement of petitioner's counsel on the argument of this application, that on the occasion of the disclosure of a prior sewer scandal, the District Attorney had requested that the borough president turn over to him any evidence of sewer irregularities in the future, that the borough president had acquiesced, and that the promissory part of his October 20th statement was, in effect, a reiteration of that engagement upon his part. The statement does not reveal the identity of the person or persons to whom it was addressed, but its further substance informs them that, while the borough president had planned to take them on a tour of the sewer for their personal verification of the facts, the alarming conclusion that there was danger of collapse had compelled a change of plan, so that while preparation would be made for a tour by anyone doubting his description of the existing conditions, Mr. Lundy considered it necessary to protect the city from possible consequences, by requesting anyone desiring to make the tour to execute a waiver or release to all parties concerned. The author of the statement was the chief executive officer of the borough at and prior to the time when he issued it. He was charged by law, under the provisions of the Charter of the City of New York, with the maintenance of this and other sewers in the borough. The occasion on which he issued the statement is not so important as the fact that it bore the seal of officialdom when it was published in an already sewer-conscious community.

It is a matter of widespread common knowledge in our county that, early in 1952, complaints by the residents of an area served by the so-called "Laurelton Sewer" had brought borough, county and city officials to examine that facility with care. As a result, investigations had been made, and the

District Attorney had brought the matter before a grand jury. Between September of 1952, and March of 1953, the evidence had been considered by that body, and on March 24, 1953, it had returned an indictment against a contractor, a subcontractor, and various employees in the borough president's office, charging them with conspiracy, bribery and other crimes constituting or intended to prevent corruption in public office. The legal skirmishes which had followed had been numerous, sharp and drawn-out. On October 16, 1953, a Judge of this court handed down a decision (*People* v. *Brinkman*, 205 Misc. 337) upon which an application was later (and successfully) made for an order setting aside the indictment. It was in this atmosphere that the citizens of the borough received its chief executive's report of his investigation into the Kissena Corridor Sewer.

It seems clear — to the court at least — that a reasonable person could and would interpret Mr. Lundy's statement as a report that he had investigated carefully into the Corridor Sewer and had uncovered evidence which strongly suggested official corruption, either in the letting of the contracts, or in the construction of the sewer, or both. It is not necessary to speculate whether the reference to sending the complete facts to the District Attorney would be interpreted as suggesting that the facts and the District Attorney's duty called for action upon the latter's part. Upon the face of the allegations contained in Mr. Lundy's statement, the District Attorney had a duty to act without suggestion by the borough president. The District Attorney proceeded to do so.

It will be observed that when Mr. Lundy's report was published, the District Attorney was already faced with the necessity for resubmitting to the Grand Jury, the matters involved in the Laurelton Sewer case. He could, of course, have appealed, but he had elected to resubmit the matter. It does not appear just when the borough president turned his evidence in the Corridor Sewer matter over to the District Attorney (assuming, of course, that he did), nor how long it took for the prosecutor to examine, organize, evaluate or supplement it, but the fact is that the District Attorney did bring the matter before the Additional March, 1954, Grand Jury.

No indictments have been handed up by that Grand Jury. Its sole return is the report (styled a " Presentment ") now sought to be expunged. The report is lengthy and couched in terms which is assumed to be the language chosen by the grand jurors themselves. Effort has obviously been made to

make the form of expression quasi-judicial, but with something less than conspicuous success. The question before this court is whether it may stand at all, and if so, to what extent.

In its essential substance, the report: —

1. Traces the instigation of the investigation to Mr. Lundy's report, and discloses that twenty-three sessions were held over a period of almost sixteen months, during which, testimony totaling over 3,300 pages was taken from some seventy-four witnesses, and some one hundred sixty-four exhibits (some of them bulky) were received and studied;

2. Reviews factually, the events preceding the petition for construction of the project and those which followed, up to and including confirmation of the assessment therefor;

3. Reviews (with a commingled digest of evidence received and the names of some witnesses) the events preceding the issuance of Mr. Lundy's statement; his specifications of excessive costs, faulty construction, excessive infiltration of ground water and imminent danger of collapse (rejecting them as unfounded); how far his official responsibility for maintenance and repair of the sewer have been discharged, and what acts have been done or omissions suffered by him in safeguarding persons on the surface of the condemned section, in the event that there should be a collapse;

4. Finds no evidence to sustain the charge of excessive costs, a '' preponderance '' of evidence that the entire construction was not faulty or defective (such defects as were found not having been shown to be the result of defective construction), a '' clear preponderance '' of evidence that the sewer is in no danger of collapse, and that the condemnation was unjustified and should be withdrawn;

5. Finds that there has been no maintenance work since the sewer has been put in operation, that damage has resulted therefrom, and recommends speedy steps to repair the existing damage;

6. Finds that there is no need for replacement of any portion of the sewer;

7. Finds a failure to establish techniques of record-keeping so that reports of inspections can be used in maintenance;

8. Recommends the establishment of a report procedure for maintenance of records as to defects found;

9. Recommends review of standard specifications for sewers to assure modernization of techniques and with a view toward eliminating possibly ambiguous and contradictory contractual provisions;

10. Recommends making permanent, a practice of "full exchange of opinion" between sewer construction and maintenance bureaus, so that maintenance of new sewers can be provided;

11. Recommends clearing out of obstructions reported to be in the Corridor Sewer;

12. Recommends removal of such matters "from the political arena", states the jury's conclusion that Mr. Lundy's charges and condemnation were based on unreliable and biased reports, purposely intended to create false impressions as to the construction and their further conclusion that his statement was issued solely to influence a then forthcoming election, incidentally rejecting as incredible, a "gratuitous" observation made in Mr. Lundy's testimony and expressing the belief that the statement was intended by all three of the petitioners to "mislead the taxpayers";

13. Finds that all three petitioners were "defiant, arrogant and hostile witnesses", that in the jury's opinion "they wilfully deceived us" and "are lacking in the proper concept of public office";

14. Expresses its displeasure with "evasive and contradictory" testimony by members of Mr. Lundy's staff (particularly the petitioners) and which, the Grand Jury say, increased the complexity of the investigation and the difficulty of arriving at a speedy conclusion as to what the facts actually were;

15. Lists numerous officials to whom copies were proposed to be sent;

16. Requests an extension of the life of the said Grand Jury. The report may stand in the respects hereinafter indicated.

It is true that this report styles itself as a "Presentment" and it is also true that in this State presentments — in the true, technical sense of that word — have long since been obsolete as a means of accusation. Section 250 of our Code of Criminal Procedure reads as follows: "*Appointment of a clerk, and his duties.* The grand jury must appoint one of their number as clerk, who is to preserve minutes of their proceedings (except of the votes of the individual members on a presentment or indictment), and of the evidence given before them."

The majority opinion in *Matter of Jones* v. *People,* (101 App. Div. 55, 56–57, appeal dismissed 181 N. Y. 389) adopted the view that the use of the word "presentment" in this statute, was in contradistinction to an indictment, and regarded it as significant in arriving at their ultimate conclusion. The opinion uses the words "presentment" and "report" interchange-

ably, and leaves no doubt that it was passing upon a right to report and, in a broad way, the extent to which such a report might go. There, as here, the court was concerned with the provisions of section 260 of the Code of Criminal Procedure, which, in part, mandates a grand jury as follows:

" *Grand jury must inquire as to persons imprisoned on criminal charges and not indicted, and the misconduct of public officers.* The grand jury must inquire,

" 1. Into the case of every person imprisoned in the jail of the county, on a criminal charge, and not indicted; and

" 2. Into the willful and corrupt misconduct in office, of public officers of every description, in the county."

This particular section then goes on to provide that the grand jury *may* inquire into the condition and management of the public prisons in the county. (Code Crim. Pro., § 260 subd. 3).

In the *Jones* case, the majority decided that there was a right to report. Said the court (p. 57): — " We may assume that these [inquisitorial and visitorial] powers are conferred for some purpose. Official inquiry intends either official action or official report. As such powers are limited to inquiry, and the grand jury has no executive or administrative authority in the premises, the result of any inquiry must be a report or statement which shall call attention to the wrong."

The majority opinion further gave in broad outline its judgment as to the permissible scope of the report. The court pointed out, that the report should be confined to general observations and conclusions and such specific recommendations thereon as might be proper. The opinion acknowledged though, that the inquiry might reveal misconduct, inattention or shortcomings of public officials and that the report might be colorless or ineffective unless it specified individual delinquencies, and that in such a case the grand jury might properly point out those individuals who, as officials, were deemed responsible (pp. 57–58). Finally, said the court, it could not be used as a guise to accuse and compel the accused to stand mute, where the presentment would warrant indictment (p. 58). It is urged, however, that the majority opinion is no longer the law of the State.

It might be more accurate to say that an impressive number of distinguished jurists favor the minority viewpoint. Some of them were functioning within the same department when their opinions were written. (*People* v. *McCabe,* 148 Misc. 330; *Matter of Heffernan,* 125 N. Y. S. 737.) On the other hand there are other jurists, equally distinguished, who do not share

the disfavor of their colleagues for the prevailing opinion. (*Matter of Healy,* 161 Misc. 582, 586–588, 593–595; *Matter of Bar Assn. of Erie Co.* [*Hagerty*], 182 Misc. 529, 531–532.) This court considers the decision in the *Jones* case controlling in this department. The majority opinion in the *Jones* case has not been overruled. The appeal was dismissed for want of jurisdiction to entertain it (181 N. Y. 389). It has been in our law reports for some fifty years, and the controversy, which had begun before the decision, has continued to the present time, here and in other jurisdictions. It would seem to call for constitutional or statutory settlement.

It may be thought that an approach in that direction was made when, in 1938, section 6 of article I, of our State Constitution, which formerly provided that no person should be held to answer for a capital or otherwise infamous crime except upon the *presentment* or indictment of a grand jury, was amended by deleting the word " presentment ", and by adding a paragraph which, in substance, prohibits the suspension or impairment by the Legislature, of the power of grand juries to inquire into the willful misconduct in office of public officers, and to find indictments or to direct the filing of informations in connection with such inquiries. If so, the approach was somewhat subtle.

The record of the 1938 Constitutional Convention (p. 2572) shows an obvious intent to avoid *guaranteeing* a grand jury's power to file " presentments " castigating public officials, but there is nothing indicating any intent to deny that power forthrightly. An attempt along those lines was later made by our Legislature.

In 1946 it passed a bill (Senate Introductory No. 509; Senate Print No. 521) providing that: —" The grand jury shall make no presentment or other public record censuring or reflecting upon the integrity of any person for alleged misconduct that does not constitute a crime." The then Governor of our State vetoed this bill. His memorandum (March 30, 1946) recalls to mind the events which had preceded the 1938 amendments to the Constitution (Public Papers of Governor Dewey [1946], pp. 140–141). In the light of those events, a degree of reasonable conjecture may be permissible as to what may lie hidden between the lines of the record of the 1938 Constitutional Convention and of the amendments effectuated through it.

It will be recalled as a matter of common knowledge that, particularly for the decade preceding the time of this Convention, public — and grand jury — attention had been directed to

the conduct of various public officials in their offices. Officials summoned before grand juries and other legally constituted investigating bodies had rested upon their constitutional right against self-incrimination and had refused to waive immunity and submit to interrogation. And an aroused citizenry had demanded action. A special session of the Legislature was called by the Governor of this State in the summer of 1931 to particularly consider the privileges of witnesses before joint legislative committees essentially created to inquire into alleged corruption in public office. The enactment of chapters 773 and 774 of the Laws of 1931 dealing therewith resulted. Constant public concern with the responsibilities, particularly of public officials appearing before legally constituted investigating bodies brought the matter before our Constitutional Convention of 1938. A proposal that public officials be required to waive immunity when called before grand juries, under penalty of the loss of office for their refusal to do so, was submitted by the Convention to the people of our State and became part of our fundamental State law by favorable public referendum. (N. Y. Const., art. I, § 6.)

The events of the times then, tend to suppport the statement of our then Governor in his 1946 veto memorandum, that the spirit and intent of the 1938 Convention and of the amendments which it brought forth was to facilitate grand jury investigations into official corruption, and to forbid a curtailment of their duty and power in that field. They would also suggest a powerful reason why the subject of banning grand jury reports in the same field would be untimely to say the least, and therefore to be shunned. In any case, *Matter of Jones* v. *People, supra*) remains unimpeached by superior judicial authority, undisturbed by constitutional and legislative authority and not disavowed by the court which decided it. It is an authority to be respected. This court feels constrained to follow it. That being so, the report will not be expunged for want of right or power to make it. Neither will it be expunged because, as petitioners contend, it was not made in the course of inquiry into willful misconduct in office of public officers.

By its terms, this report presently before us professes to set forth the results of an investigation into the validity of Mr. Lundy's " charges ". But as already observed, the substance of those " charges " was such that, if true, the putrid odor of corruption had to be traced to the dead body of a foully and fatally abused public trust. The logical — if not essential — order of procedure would be to establish first, the

*corpus delicti* and then, the identity of the criminals.  In the absence of a reasonable suggestion that the actions of the Grand Jury were otherwise, it must be presumed that their conduct of the investigation was regular and lawful.  Nothing in the report has the slightest tendency to rebut such a presumption.  To the contrary, it is clear that the legitimate aim of the inquiry was to determine whether a crime or crimes had been committed through willful corruption in public office.  We may not doubt that the Grand Jury would have returned indictments if warranted.  But they did not.  They reported, in detail, that there was no evidence of crime and therefore no cause for indictment.  But they went further and criticized the petitioners who, for that reason, complain that the investigation was diverted and thereby turned against them.

But there is nothing to suggest that such was the case.  Having embarked upon a legitimate investigation, the Grand Jury could take and consider evidence of petitioners' conduct in office.  Not sharing Justice KNAPP's confidence that all willful and corrupt misconduct of public officers in office is now somewhere defined in our law as criminal (*Matter of Wilcox,* 153 Misc. 760, 766) this court can envisage a number of possibilities which would warrant report without indictment.  Since this opinion has already passed and seems likely to even further pass the limits which were originally anticipated, they will not be discussed now.  The point is, that a scrutiny of petitioners' conduct in office need not have been the aim of this investigation to justify a report of their acts or omissions in office, and, as already pointed out, there is no suggestion that it was.  The Grand Jury were seeking to determine whether, as reported by Mr. Lundy, his predecessors in office had caused or suffered contracts to be let at grossly excessive prices or had suffered the sewer to be built shoddily, or both.  In view of the nature of the duties of sewer inspectors, field engineers and auditors, it is impossible for a "high command" to suffer — or contrive — such practices in secrecy.  Somewhere in the lower echelon there must be at least equal responsibility for ineptitude, or worse.  But when Mr. Lundy's predecessors left office, the lower echelon, being in a civil service status, remained.  Had any in the ranks been privy to a conspiracy to defraud the city in the construction of the Corridor Sewer, it would plainly be in their interests to conceal their prior conduct from the new executive, Mr. Lundy.  And it would be more emphatically in the interests of public justice for the Grand Jury to ferret them out.  The Grand Jury could therefore be, and obviously was, concerned

with persons and occurrences under Mr. Lundy's regime. Its report sets forth its finding along those lines, so that we are brought back to the question whether it exceeds proper bounds and if so, how far.

In passing upon that question the court obviously cannot edit the report. So far as independent and severable, the portions which are considered to be within the field of legitimate report under the *Jones* case are permitted to stand. Otherwise, the very substantial work of this Grand Jury will have gone for naught. But where the good, bad and questionable are hopelessly commingled, the whole of such portions must be expunged.

The content of pages one to eleven, down to but not including the paragraph beginning:—" The evidence indicates " etc., at the foot of page eleven is allowed to stand as a detailed but factual report of the Grand Jury's findings.

So much of the content as appears in the paragraph just last mentioned, up to but not including the title " Conclusions and Recommendations " on page thirty-eight is expunged. Commingled with the matters therein set forth is a digest of evidence received, and names of witnesses who gave it. This is not permitted.

By law, the grand jurors are broadly enjoined to secrecy. (Code Crim. Pro., §§ 245, 246, 265.) Specifically, unless required to do so by a court or officer, a grand juror who willfully discloses any evidence adduced before the grand jury is guilty of a misdemeanor. (Penal Law, § 1783; cf., also, Code Crim. Pro., § 266, and *Matter of Additional Part I Term for September,* 1945, County Ct., Kings Co., February 5, 1946, TAYLOR, J., unreported.) There was no prior authority for the revelation of such evidence in this case and certainly the *pro forma* acceptance of the report did not sanction it. There is no doubt whatever that the disclosure was well intended and possibly it was ill-advised. Nevertheless, the disclosure is unlawful, and not being severable, the whole of the matter above indicated is expunged.

The content appearing under (and including) the title " Conclusions and Recommendations " on page thirty-eight, up to but not including the series of paragraphs numbered (12) on page forty is allowed to stand as a statement of the findings of fact and the legitimate conclusions and recommendations, excepting however, the words " and should be publicly withdrawn by Borough President James A. Lundy " in paragraph (4) on page 39, which said portion is expunged. True the borough president's condemnation of the section was, in effect,

a solemn assurance to the community, as to the genuineness of his apprehensions. The Grand Jury have found as a fact that it was not justified. That is sufficient. Whether the recommendation should be withdrawn is a matter to be litigated between Mr. Lundy and the city officials properly concerned therewith.

The other recommendations are on a different, and proper plane. They did not originate as collaterals to an " ordinary " grand jury investigation. The specific aim and purpose of this investigation was to discover official dishonesty, if any. And if the rationale of the *Jones* case has been correctly perceived, specific recommendations were in order. There is a sensible reason why that should be so.

It is more than just a theory that a conscientious inquiry in obedience to the statute (Code Crim. Pro., § 260) may reveal inadequate procedures in the administration of the business of public office.

Public welfare dictates that a grand jury in a legitimate inquiry may report recommendations designed to impel public officials to eliminate ineptitude in their offices and to close the doors to any corridor of possible fraud.

For the greater part, the recommendations made in this report are designed to accomplish this salutary purpose.

Exhibit A annexed to the report is allowed to stand. The balance of this report, excepting only the Grand Jury's request for continuing of its term, the date, and the signatures of the grand jurors (on pages 42 and 43) is expunged.

Whatever may be its convictions along those lines, it is not for the Grand Jury to suggest a code of ethics to govern political contests. If it be convinced that evidence is unworthy of belief for any one of a number of sound reasons it may and should take that into account in passing upon the credibility of the witness, but it should not incorporate into its findings its reason why the testimony was rejected in whole or in part, and necessarily, the same is true of motivation, which is another element of credibility. The borough president's " gratuitous " observation was a part of his testimony, whether gratuitous or otherwise, and should not have been revealed. Finally, the conduct of the petitioners before the Grand Jury, besides being entitled to consideration in connection with credibility could, had the circumstances warranted, been dealt with in proceedings looking toward their punishment for contempt. There having been no such proceedings, it must be assumed that, however defiant or hostile they were, their testimony was adduced. That, in the final analysis,

is all that matters, and the same is true of the members of the borough president's staff, apart from the present petitioners. As for the alleged willful deception practiced by petitioners, the Grand Jury has, as already pointed out, found no indictment. Neither have they presented a finding directing the prosecution of anyone for any other crime. They have not applied to the court for instruction, and presumably, have found no cause to accuse anyone of perjury in any degree. If perjury was committed, those responsible should be prosecuted therefor. If not, they may not be accused without an opportunity to defend themselves. Needless to say, the alleged deception, if it occurred, was not an act of a public official in the administration of the business of his office. It was an incident in the investigation. It was not therefore, properly incorporated in the report. And finally, fitness for office — short of that requiring removal by lawful proceedings — is an issue to be tested in another forum. It is not a proper element in what is required to be a factual report after investigation.

Prepare and submit order on five days' notice accordingly.