9 N.Y.2d 144 (1961)
In the Matter of James F. Wood, Individually and as Foreman of the May, 1959 Term of the Grand Jury for the County of Schenectady, Appellant,
v.
Charles M. Hughes, as Justice of the Supreme Court of the Fourth Judicial District of the State of New York, Respondent.
Court of Appeals of the State of New York.
Argued November 28, 1960.
Decided February 23, 1961.
Morris Marshall Cohn, District Attorney, for appellant.
Louis J. Lefkowitz, Attorney-General (Dunton F. Tynan and Paxton Blair of counsel), for respondent.
Manuel Lee Robbins for Grand Jury Association of New York County, Inc., amicus curiæ.
Judges DYE, VAN VOORHIS and FOSTER concur with Judge FULD; Chief Judge DESMOND and Judge FROESSEL dissent in separate opinions; Judge BURKE concurring in both.
*147 FULD, J.
Although long the subject of controversy in our lower courts, this is the first time that we have had the occasion to consider whether a grand jury, whose investigation into charges of misconduct on the part of public officials uncovered no evidence warranting an indictment, may, nevertheless, present to the court for filing as a public record a report which censures and castigates their conduct in office.
The case before us arises out of an inquiry by a Schenectady County Grand Jury into charges leveled against the County Highway Department. The investigation yielded no evidence *148 of corruption or other criminality and, accordingly, as the grand jury itself recognized, there was no basis for any indictments. Despite this, the grand jury prepared, and sought to have filed and made public as a "court record," a 19-page report, most of which is devoted to criticism of the practices of the Highway Department as "contrary to the general interests of the public".[1] Although it does not expressly name the individuals involved, the report leaves little doubt as to the identity of the persons responsible for the claimed derelictions. The court "received" the document, but, except for one paragraph dealing with conditions of windows in the county jail, ordered it "sealed", to be opened only upon court order.
Thereupon, the foreman of the grand jury, asserting that the report deals with "matters of great public concern and interest" and pertains to "the proper * * * administration of government and the conduct of public officials", instituted this article 78 proceeding to compel the Supreme Court Justice who had presided over the term for which the jury had been drawn to file it as a public record. The Appellate Division dismissed the petition. The only prior appellate court decision is to the contrary (Matter of Jones v. People, 101 App. Div. 55, appeal dsmd. 181 N.Y. 389) and opinion at the trial court level has been divided.[2] We granted leave to appeal because of the importance of the question in the administration of justice.
*149 We pass over quickly the respondent's contention that the petitioner lacks standing to bring this proceeding. He sues both as foreman of the grand jury and individually and, whether or not he may sue in his individual capacity, it is clear that he does have status to sue as foreman of the grand jury responsible for the report. The circumstance that the term of that grand jury had expired did not preclude him from instituting the present proceeding, particularly in view of its great public importance. (See, e.g., Matter of Plumbing Assn. v. New York State Thruway Auth., 5 N Y 2d 420, 422, n. 1; Matter of United Press Assns. v. Valente, 308 N.Y. 71, 76; Matter of Adirondack League Club v. Black Riv. Regulating Dist., 301 N.Y. 219, 222.)
Turning to the merits, we note, first, that in this State the grand jury derives its powers solely from Constitution and statute (N. Y. Const., art. I, § 6; Code Crim. Pro., pt. IV, tit. IV, ch. II, §§ 223-260; see People v. Stern, 3 N Y 2d 658, 661). While the Constitution does provide that the common law is continued as the law of New York, it explicitly declares that it is only continued "subject to such alterations as the legislature shall make concerning the same" (N. Y. Const., art. I, § 14; see, also, N. Y. Const. of 1777, art. XXXV). And the detail and comprehensiveness of the legislation enacted to regulate the duties, powers and functions of the grand jury (Code Crim. Pro., §§ 223-260) leave no doubt that the Legislature manifested its intention to supplant the common law on the subject. In fact, the Commissioners on Practice and Pleadings, who in 1849 *150 recommended the prototype of the present statute (see Report to N. Y. State Legislature of Commissioners on Practice and Pleadings on Code of Criminal Procedure [1849], pp. 115-129), regarded the then existing common-law powers of the grand jury as "vague and unlimited" and proposed the new provisions for the very purpose of supplying "a clear and well understood definition of [the grand jury's] powers" (p. 115). It is, accordingly, pointless to probe the uncertain state of the common law as to the grand jury's powers.[3] If there is authorization for a grand jury report, it must be found in either Constitution or statute.
The only constitutional provision on the subject was first adopted by the 1938 Constitutional Convention and added to the Constitution the following year. Contained in article I, section 6, it reads as follows: "The power of grand juries to inquire into the wilful misconduct in office of public officers, and to find indictments or to direct the filing of informations in connection with such inquiries, shall never be suspended or impaired by law". As the discussion preceding adoption of the amendment discloses (see Revised Record of Constitutional Convention of 1938, Vol. 3, pp. 2570-2573), it had nothing whatsoever to do with the grand jury's power to make or file a report. On the contrary, after noting that there "is very grave doubt" whether that body has "any such power * * * at all", its proponent, the Honorable PHILIP HALPERN, stated that he drafted the provision "very carefully to avoid the question" (p. 2573). Actually, as Delegate HALPERN explained to the Convention (p. 2571), the proposal was advanced solely for the purpose of making certain that the Legislature of this State would never be able to do what the Legislature and Governor of Pennsylvania had attempted, namely, take from the grand jury its authority to investigate and indict for alleged criminal acts by public officials. (See, also, Dauphin County Grand Jury Investigation Proceedings [No. 2], 332 Pa. 342, 346 et seq.; *151 Note, 52 Harv. L. Rev. 151.)
These clear expressions of the purpose thus sought to be accomplished by the quoted provision of section 6 of article I find precise embodiment in its language. Not only does it avoid any intimation of a grand jury power to make or publish a report, but, in so many words, it inseparably links the grand jury's power "to inquire into the wilful misconduct of public officers" with its power "to find indictments * * * in connection with such inquiries". Here, rather than constitutional recognition of a power to report, is explicit constitutional guarantee of a power in the grand jury to inquire and indict.
Nor does any provision of statute suggest that the grand jury has the power to make a report directed at supposed mismanagement by public officials. Section 223 of the Code of Criminal Procedure defines a grand jury as "a body of persons * * * sworn to inquire [into] crimes committed or triable in the county." Section 245 declares that the grand jury has the "power", indeed, the "duty, to inquire into all crimes committed or triable in the county, and to present them to the court." And section 253 requires and authorizes the grand jury to "inquire" (1) into "the case of every person imprisoned in the jail of the county, on a criminal charge, and not indicted"; (2) into "the wilful and corrupt misconduct in office, of public officers of every description, in the county"; and (3) into "the condition and management of the public prisons in the county." The plain and simple fact is that, although the Legislature has, in 40 separate sections of the Code of Criminal Procedure, dealt in most comprehensive and detailed fashion with the grand jury, its powers and functions (§§ 223-260), it nowhere mentions reports, much less authorizes their filing or publication.
It is urged, however, that a power "to inquire" necessarily implies a power to report the result of the inquiry and that, therefore, the power given the grand jury by section 253 to inquire into "wilful and corrupt misconduct" of public officials authorizes the publication of the report here in question. The argument is not persuasive.
The key words are not the words "to inquire" but, rather, "wilful and corrupt misconduct". Every action by a grand jury presupposes an inquiry; the subject matter of the inquiry *152 must be found in other words. Here, the jury did inquire and, by its own admission, failed to find that there was "wilful and corrupt misconduct". Where, then, is the authority for it to publish, under the immunity which attaches to grand jury actions, any more than the statement that no evidence of such misconduct was found?
Indeed, if the argument advanced  that the power to report is implicit in the power to inquire  had merit, it would mean that the grand jury would likewise be entitled, by virtue of section 245 of the Code which requires it to "inquire into all crimes", to make and publish a report in any and every case whether touching on the conduct of public officers or the behavior of private citizens. Such a consequence, involving the possibility of the publication of an untold number of reports concerning every variety and aspect of private life, could hardly have been intended by the limited legislative grant. Even if the language were less clear than it is, we would hestitate to conclude that the 1849 draftsmen of the Criminal Code, who believed that the preservation of the grand jury's usefulness "depends upon a clear and well understood definition of its powers" (Report to N. Y. State Legislature of Commissioners on Practice and Pleadings on Code of Criminal Procedure [1849], p. 115, supra), intended to confer such an important and controversial power as that here asserted by surmise and implication.
The natural interpretation of section 253, subdivision 2, links it appropriately to the definition of the grand jury as a "body * * * sworn to inquire [into] crimes" (Code Crim. Pro., § 223). The Legislature has spelled out in great detail the particular acts of commission and omission on the part of public officials which are made criminal (Penal Law, art. 170, entitled "Public Office and Officers", §§ 1820-1878). And the legislative mandate to grand juries to "inquire" into "the wilful and corrupt misconduct * * * of public officers" (Code Crim. Pro., § 253, subd. 2) necessarily has reference to those acts on the part of public officials which are declared to be crimes under the Penal Law; the concept of willful and corrupt official misconduct which does not amount to crime is self-contradictory and meaningless. As a former judge of this court wrote many years ago (Medalie, Grand Jury Investigations, The Panel, Vol. 7, No. 1, p. 5):

*153 "The statute [present § 253] is silent as to what the grand jury is required to do after * * * an inquiry. In the case of willful and corrupt misconduct of public officers, it is quite clear that there is no form of corrupt misconduct in office which is not the subject of indictment. Therefore, in that instance at least, there being no other enlargement of powers to the grand jury, their function is limited to the finding of an indictment."
Thus, there is simply no basis in the statute for assuming that the Legislature intended to invest the grand jury with the power to condemn public officers according to its own standards of right and wrong, as distinguished from those clearly expressed in penal statutes, in other words, to accuse officials in a court record of conduct which the Legislature has not chosen to denominate as criminal or unlawful. To hold that subdivision 2 of section 253 authorizes reports such as that here in issue, we would have to equate "wilful and corrupt misconduct" with "inefficiency" or "mismanagement" or the like (see Matter of Jones v. People, 101 App. Div. 55, 57-58, supra)  a construction which does violence to words whose meaning is deeply imbedded in our jurisprudence.
In view of the general power conferred by section 245 of the Code to inquire into all crime, it may not, strictly speaking, have been essential to provide, in section 253, for inquiry into willful and corrupt misconduct in public office. It does not follow, however, that the power of inquiry conferred by the latter section was designed to render the grand jury a board of censors of public officials. Rather, its purpose was to make clear to public officials and public prosecutors, as well as to the grand jury itself, that the cloak and prerogative of public office were not to operate as a shield against the grand jury's duty to inquire into charges of crime, including willful and corrupt misconduct in office.
A reasoned analysis of the relevant provisions of our Constitution and Code of Criminal Procedure leads ineluctably to the conclusion that the grand jury inquiry authorized by section 253, subdivision 2, as well as by section 245, must result in either an indictment (§ 268) or a dismissal of the charge (§ 269) and that the grand jury may not, under cover of the power to inquire, employ a report to accuse an individual of *154 misconduct or laxity in public office any more than it may do so to charge him with misbehavior in private life. The grand jury's historic function, as embodied in our statute, is to determine whether there is evidence establishing the commission of crime. If there is such evidence, the grand jury ought to find an indictment. If, however, there is no such evidence, it must dismiss the charges or remain silent. "There are two great purposes" to be served by the grand jury, Judge WOODWARD wrote in his masterly dissent in Matter of Jones (101 App. Div., at p. 61), "one to bring to trial those who are properly charged with crime, the other to protect the citizen against unfounded accusation of crime. When the grand jury goes beyond this and attempts to set up its own standards, and to administer punishment in the way of public censure, it is defeating the very purposes it was intended to conserve, and its action cannot, therefore, be lawful."
In the public mind, accusation by report is indistinguishable from accusation by indictment and subjects those against whom it is directed to the same public condemnation and opprobrium as if they had been indicted. An indictment charges a violation of a known and certain public law and is but the first step in a long process in which the accused may seek vindication through exercise of the right to a public trial, to a jury, to counsel, to confrontation of witnesses against him and, if convicted, to an appeal. A report, on the contrary, based as it is upon the grand jury's own criteria of public or private morals, charges the violation of subjective and unexpressed standards of morality and is the first and last step of the judicial process. It is at once an accusation and a final condemnation, and, emanating from a judicial body occupying a position of respect and importance in the community, its potential for harm is incalculable. A grand jury report  which as a judicial document obviously differs radically from newspaper charges of misconduct  carries the same sense of authoritative condemnation as an indictment does, without, however, according the accused the benefit of the protections accorded to one who is indicted.
It is quite true, as urged upon us, that over the years numerous lower court judges have accepted reports for filing, but this does not supply the answer to the question whether the grand jury possesses the right or power to make reports. In many instances, the reports contained nothing which could have occasioned harm *155 or prejudice to anyone and no one, therefore, felt called upon to oppose their being filed. These reports, it is plain, were tolerated, not sanctioned. (See, e.g., Matter of Osborne, 68 Misc. 597, 603-604, supra; Matter of Gardiner, 31 Misc. 364, 367, supra.)[4] In any event, though, the exercise of a nonexistent right or power gains no sanction by repetition, especially when such exercise has gone unchallenged. However, as noted above (pp. 148, 149, n. 2), where the subject has been considered, most courts, both in this State and in other jurisdictions, find the grand jury report legally unauthorized and morally obnoxious.
We, of course, require free and open discussion of public affairs and of public office, but the right of free speech has nothing to do with the question whether the Legislature has vested in the grand jury the right to file a report of official misconduct or laxity in cases where there is no evidence of crime warranting indictment. As is manifest, there may be full discussion of performance in public office without running the risk  which would attend the publication of such reports  of converting the grand jury into a body of political supervisors and of appearing to put the court, of which the grand jury is an arm, into politics as well.
Grand jurors are not selected for their skill in appraising efficiency in public office or delving into matters more appropriately reserved for executive or legislative action. (See Matter of United Elec., Radio & Mach. Workers, 111 F.Supp. 858, 864-865, supra.) Moreover, the secrecy which necessarily surrounds the action of the grand jury prevents fruitful debate as to the merit of its charges, and the immunity which surrounds its members removes the normal restraint against recklessness. Under these circumstances, there is grave danger that grand jury reports may as readily be used as instruments of unfair partisan politics as of public enlightenment.
It is indisputable that public officers be held to a high standard of performance. It is also indisputable that free and *156 open criticism of the conduct of public office is part of the very lifeblood of our democracy. But these propositions are as irrelevant to the issue before us as they are unassailable. What is at issue here is not the integrity of a public official or his performance in office, but rather the process or procedure to be employed in charging and judging him. To be deplored, and avoided in the absence of a clear grant of legislative authority, is not public criticism of officials, but criticism contained in a court report which, while it carries, at least, the aura of a judicial pronouncement, denies to the persons involved any of those safeguards designed to protect against the violation of cherished individual rights.
The Appellate Division order should be affirmed.
Chief Judge DESMOND (dissenting).
I dissent. This decision deprives New York grand juries of a power and duty they have had for three centuries, strips an 80-year-old statute (Code Crim. Pro., § 253, subd. 2) of all meaning or effect, and ignores the prohibition of our State Constitution (art. I, § 6) against impairment of "The power of grand juries to inquire into the wilful misconduct in office of public officers". It overrules the only previous New York appellate court holding on the subject (Matter of Jones v. People (101 App. Div. 55 [1905]). It approves the complete suppression of a temperate, reasoned criticism by grand jurors of the conduct of public affairs in their county. A reversal of this order and a reinstatement of the grand jury's report is required by the Constitution and the Code of Criminal Procedure and by the policy and tradition they express.
The grand jury is not a creature or subordinate of the court but "insofar as its jurisdiction is concerned, it is an independent body" to which the law has afforded "the widest possible latitude in the exercise of [its] powers" and has "insisted that in the absence of a clear constitutional or legislative expression they may not be curtailed" (People v. Stern, 3 N Y 2d 658, 661, 662). To deny the grand jury's power to investigate and report on official misconduct is to deny history, as Judge FROESSEL'S scholarly opinion shows. The records of the New York County District Attorney's office show that in that county alone about 500 grand jury reports have been filed and made public and that the only one which was refused filing was a report which *157 did not involve any public officials or public affairs (see Matter of Grand Jury [T. V. Quiz Program], 19 Misc 2d 682). Any newspaper reader knows that such reports are regularly and frequently filed and publicized all over this State.
And if history, tradition and practice are not enough, we have a statute imposing the duty in words which permit no other meaning. Subdivision 2 of section 253 of the Code of Criminal Procedure says: "The grand jury must inquire * * * Into the wilful and corrupt misconduct of public officers of every description, in the county." It was passed in 1881 (as Code Crim. Pro., § 260) at the same time as present section 245 (then § 252) which confirmed the other fundamental right and duty of grand juries "to inquire into all crimes committed or triable in the county, and to present them to the court." The section 253 function of inquiring into official misconduct of public officers is obviously and necessarily distinct from the general grand jury business of investigating charges of crimes and of voting indictments. To construe the separate command of section 253 as meaning that an investigation thereby commanded must lead to an indictment or a no-bill or lead nowhere is to divest section 253 of any meaning or purpose and to make it completely redundant. The enactment of these two statutes concurrently in 1881 was part of a long effort to provide a complete criminal code for the State (see Fourth or 1849 Report of Commissioners of Practice and Pleadings recommending these laws, and see reference in Matter of Gardiner, 31 Misc. 364 [1900] to a proposed criminal code submitted in 1850). It is patent that the commission and later the Legislature were codifying the then existing traditional law which made it the duty of grand juries not only to investigate crime generally but additionally to inquire into and report on charges of official misconduct whether criminal or not.
The post-1881 legislative history of present section 253 shows continued recognition of this separate power of the grand jury to report on misconduct in public office. Section 253 from its origin stated two other grand jury powers: to inquire "Into the case of every person imprisoned in the jail of the county, on a criminal charge" and to inquire "into the condition and management of the public prisons in the county". As to each of these the word used from 1881 to 1939 was "must". In 1939 (ch. 770) the statute was amended so that thereafter it provided that, while grand juries "must" inquire into official misconduct *158 and into the cases of persons in jail on criminal charges, a grand jury now "may" inquire into the condition and management of local places of imprisonment. The change was made to relieve grand juries of a burden of inspection borne in modern times by the State Department of Correction (see Governor's bill jacket). But, as to inquiring into "the wilful and corrupt misconduct in office of public officers of every description in the county", the mandatory language remained unchanged.
Recognition by the Legislature and the Governor of the existence of this power and duty appeared in unmistakable terms in 1946. Passed that year (Sen. Pr. No. 521) but not signed by the Governor was a new section of the Code of Criminal Procedure numbered 272-a which would have forbidden a grand jury's making a "presentment or other public record censuring or reflecting upon the integrity of any person for alleged misconduct that does not constitute a crime." Such language would not in itself have completely wiped out the investigative and reportorial duty described in section 253 (which would not have been repealed) but the new section would have forbidden any report which attacked the "integrity" of a person on the basis of alleged misconduct not amounting to crime. The bill was passed but vetoed by Governor Dewey. His message, like the bill itself, confirmed the grand jury's power and duty of examining into and issuing reports on charges of wrongdoing by officials. The Governor, who was certainly informed and experienced as to such matters, went much further and stated in his opinion that: "The ancient power of grand juries to inquire into the conduct of public offices and to make presentments concerning their findings has been one of the most valued and treasured restraints upon tyranny and corruption in public office." He called attention to the 1938 constitutional amendment forbidding impairment of the power. The Governor's message ended with this statement: "We are dealing here with a power and a right almost as sacred as that of the writ of habeas corpus. It must not be impaired. By the same token it must not be whittled away, bit by bit. The institution of the grand jury is the bulwark of protection for the innocent and the sword of the community against wrongdoers. Its errors can always be corrected. Any weakening of its strength to act would be an irreparable loss to the citizens of a free Republic."
*159 The bill passed in 1946 was an attempt to keep out of these grand jury reports material reflecting on the integrity of particular officials. Even such a limitation was, in the Governor's opinion, a dangerous and undesirable weakening of powers essential in a democratic state. Yet the courts are now wiping out the power itself.
I agree with Judge FULD that cases in other jurisdictions are of little aid in deciding this lawsuit, since we are dealing with New York history and traditions and with our own Constitution and statutes. The Jones case (101 App. Div. 55, supra) decided in 1905 was until this present litigation the only appellate decision on the question in this State. With one Justice dissenting, the court in Jones disposed of all the objections then made and now made to the issuance of these grand jury reports about public officers. A number of modern decisions (Healy, 161 Misc. 582; "Doe", 176 Misc. 943; Lundy, 208 Misc. 833; Quinn, 5 Misc 2d 466) are in accord with Jones. We are cited to a considerable number of lower court holdings said to be to the contrary. With deference I say that when stripped of dicta and view of individual Judges as to proprieties, etc., none of the cases cited by Judge FULD are in point. For instance, the TV case (19 Misc 2d 682) and Matter of Grand Jury Assn. v. Schweitzer (11 A D 2d 761) both refer to the same grand jury report which did not deal with public officers or public business at all. The Clay case (7 Misc 2d 84) disapproved of a report which differed with judicial officers on a point of law as to the conduct of grand jury proceedings. Osborne (68 Misc. 597) is similar to Clay. The McCabe decision (148 Misc. 330) was on a motion to change the venue of a criminal cause. Crosby (126 Misc. 250) held that the power exists but was improperly exercised. In Funston (133 Misc. 620) the report was improper because it charged a crime which should have been made the subject matter of an indictment. Matter of Gardiner (31 Misc. 364, supra) is strong basis for reversal here. The Gardiner case, decided in 1900, is the one nearest in time to the passage in 1881 of the law which is now section 253. The Gardiner opinion did not deny the power. It expunged a report because it was not founded on legal evidence (see Code Crim. Pro., § 249) and because it was made on the advice of a clergyman who was not a member of the jury. So the supposed weight of authority dwindles *160 to nothing and the real precedents are in the hundreds of such reports which have been received, filed and made public.
Little time need be spent on the argument that "wilful and corrupt misconduct" means conduct which is criminal and so is adequately covered by the inquiry and indictment authorizations of section 245. It is not the function of a court to destroy a statute by giving it an absurd meaning or by accusing the Legislature of doing a vain or unnecessary thing. "Wilful and corrupt misconduct" should be construed, as most New York courts have construed the phrase, to have the same meaning as "wilful misconduct in office of public officers" in the State Constitution (art. I, § 6)  that is, mismanagement or wrongdoing not amounting to crime. A similar answer is available to the argument that section 253 authorizes an investigation but not a report. Such a futility is not to be ascribed to the Legislature. Section 253 covers investigations not only into official misconduct but also into the cases of persons held in jail and the condition and management of prisons. In each such instance, investigation without report would be nonsensical. Indeed, the very report we are considering had a section describing the conditions of some windows in the Schenectady County Jail. That part of the report was received by the court and the rest of the report was suppressed, yet the grand jury's duty to "inquire" is the same as to each of the subdivisions of section 253.
The question here is one of positive law, of Constitution and statute as explained by history and tradition. The grounds stated for curtailing the anciently assumed and modernly authorized power are grounds which no court may consider as against the prohibition of the Constitution and the command of the statute. It is unfair, we are told, to allow the grand jury to make public an accusation without giving the accused the right to meet it. The first answer is that Judges sit not to enforce their subjective notions of fairness but to apply the law. The second answer is that this is a duty of scrutinizing not private persons but public officials, not private affairs but public business. Unfairness, if any, must be tolerated or at most kept in check. Charges of misconduct in public office are continually and freely made in newspapers and other media. The Legislature has set up various bodies which make it a practice to spread such charges before the citizens (e.g., State Commission of Investigation, L. 1958, ch. 989, § 2; New York City Commissioner *161 of Investigation, New York City Charter, §§ 801-805). All this (see Chief Justice VANDERBILT'S great opinion in the Camden County case, 10 N. J. 23, 40, 44 et seq.) is an occupational hazard of the uneasy trade of public service, part of the price which office holding exacts and part of the protection of the public weal in a free society. No court has the right to cut down that protection. And nothing is more hostile to the central spirit of American political philosophy than to allow any public officer to suppress and bury a relevant, nonscandalous commentary on public affairs by an authorized body of citizens.
The order should be reversed and the prayer of the petition granted.
FROESSEL, J. (dissenting).
The crucial question in this case is whether a lawfully constituted grand jury, after it has made an investigation and taken extensive evidence over a period of months with respect to charges of misconduct in a public office, has the right to file with the court a report or presentment embodying its findings and conclusions, and whether such report if filed may be suppressed by the court.
The Justice presiding over the Grand Jury Term received its report, but suppressed the same (with the exception of a paragraph dealing with window sashes and frames in the county jail) upon the ground (1) "there is no statutory authority for the same", and (2) "the Grand Jury went beyond its functions in making this report" (22 Misc 2d 958, 960). The Appellate Division, in the course of its memorandum decision stated: "In any event we think the Justice * * * must have discretion * * * in determining what is useful and what might be harmful" (11 A D 2d 893, 894).
A majority of this court deny the right of the grand jury to make reports under any circumstances whatsoever, requiring it either to return an indictment, or, should it be unable, by reason of lack of corroboration, of unco-operative or evasive witnesses, or for other legal reasons, to find an indictment against a particular individual, it must "remain silent", no matter what conditions contrary to the public interest may have been developed by the evidence before it. We do not agree. We are, however, in accord with the majority that petitioner does not lack standing to bring this proceeding.
*162 The problem before us has been the subject of much scholarly research by courts and commentators alike (see, e.g., Matter of Jones v. People, 101 App. Div. 55 [2d Dept.], appeal dsmd. 181 N.Y. 389; Matter of Grand Jury [T. V. Quiz Program], 19 Misc 2d 682, related case Matter of Grand Jury Assn. v. Schweitzer, 11 A D 2d 761; In re Camden County Grand Jury, 10 N. J. 23; In Re Report of Grand Jury, 152 Md. 616; The Grand Jury "Presentment": Foul Blow or Fair Play?, by Richard H. Kuh, 55 Col. L. Rev. 1103; Dession and Cohen, The Inquisitorial Function of Grand Juries, 41 Yale L. J. 687; Konowitz, The Grand Jury as an Investigating Body of Public Officials, 10 St. John's L. Rev. 219; 37 Minn. L. Rev. 586; 52 Mich. L. Rev. 711; 29 Fordham L. Rev. 152). Despite the conflicting views, the submission of grand jury reports in this State has nevertheless continued since Colonial times.
For the resolution of the problem before us it is necessary to review this practice in its early settings. At common law, grand juries freely exercised the power to make presentments or reports, and the power has been exercised for well over three centuries. They investigated and reported on public matters, encompassing such subjects as misconduct in public office, abusive market practices, excessive increase of horse races, cockfighting, the maintenance of bridges and highways and public property (10 Holdsworth, History of English Law [1938] 146-149; see, also, cases and commentators previously cited).
As early as 1684, the Earl of Macclesfield sued a member of a grand jury in an action of Scandalum Magnatum (libel), because that grand jury had charged him  though not in an indictment  with disloyal and seditious conduct. Plaintiff argued that the grand jury may only charge specific crimes "in such a manner as that the party accused may have recourse to that court to defend himself, by examination and trial"; any other practice would "cross all the administration of justice which provides means and remedies as well to acquit the innocent as to punish the guilty". The defense maintained that "it is the constant universal practice" of grand juries to present any matters concerning the business of the county in "every assizes and sessions". The Barons of the Court of Exchequer who heard the cause rendered a unanimous judgment for the defense (10 How. St. Tr. 1330, 1346, 1356).
*163 This well-established practice regarding grand jury presentments with respect to matters of public concern was introduced in this country by our early colonists. Goebel and Naughton, in their "Law Enforcement in Colonial New York" (1944), at page 361 et seq., report many instances of such presentments as early as 1688, as, e.g., against persons "who ride over corn fields"; that persons selling spirits must keep lodgings for horse and man (Minutes of Albany County Court of Sessions [1685-1689]); with regard to repairing highways in Kings and Ulster Counties as well as instances in other counties of the State. (See, also, Matter of Quinn, 5 Misc 2d 466, 469.) Chief Justice VANDERBILT reports of the practice in New Jersey in In re Camden County Grand Jury (supra, at pp. 41-44).
This practice continued in New York as part of our common law down to the time of the adoption of our first Constitution in 1777, and indeed to the present day. In that Constitution it was provided (art. XXXV) that "such parts of the common law of England * * * and of the acts of the legislature of the colony of New York, as together did form the law of the said colony on [April 19, 1775], shall be and continue the law of this State, subject to such alterations and provisions as the legislature of this State shall, from time to time, make concerning the same". That provision has remained in our Constitution to the present time (art. I, § 14). Thus the grand jury's power at common law to file reports is not a "mooted question", nor may we "rightfully neglect the common law", as the majority would have us do.
Inasmuch as the Legislature has not changed the common-law right of grand juries to make presentments, how can we say they are now unauthorized? Looking to the decisions of other States will not help us, for they are governed by their own laws. Nor will it serve any useful purpose to review the conflicting decisions of our courts of first instance, many of which do not deal with the precise problem before us, as Chief Judge DESMOND clearly points out.
It is true that the grand jury in this State derives its powers from our Constitution (including the common law incorporated therein) and our statutes and, in the absence of a clear constitutional or legislative expression, they may not be curtailed (People v. Stern, 3 N Y 2d 658, 661). In our first Constitution no reference was made to the grand jury, and it thus continued *164 as at common law. In subsequent Constitutions the grand jury is recognized, but its power to make presentments for the information of the public has never been abrogated  either by Constitution or by statute  and so it remains to this day.
Notwithstanding the fact that the right of a grand jury to make presentments has over the centuries been bitterly assailed by some, and strongly defended by others, of which the members of the New York State Constitutional Convention of 1938 were fully aware  even noting the only appellate decision in this State, and which upheld the right (Matter of Jones v. People, 101 App. Div. 55)  they took no action to impair that right (1938 Constitutional Convention, Problems Relating to Judicial Administration and Organization, Vol. IX, pp. 860-865). Indeed, without disturbing any existing right of the grand jury, they in their proposed amendment guaranteed that the following rights may never be disturbed by law: "The power of grand juries to inquire into the wilful misconduct in office of public officers, and to find indictments or to direct the filing of informations in connection with such inquiries, shall never be suspended or impaired by law" (art. I, § 6). As Delegate HALPERN, who prepared the amendment, said, "this provision does not guarantee the right to make presentments" (emphasis supplied) (Revised Record of N. Y. State Constitutional Convention [1938], Vol. III, p. 2573), thus clearly recognizing that the right existed, but leaving to the Legislature the power to divest grand juries of that right.
There can be no question that the Legislature continued this common-law power in section 253 of the Code of Criminal Procedure which provides:
"The grand jury must inquire, * * *
"2. Into the wilful and corrupt misconduct in office, of public officers of every description, in the county" (emphasis supplied) for, as was stated in the plainest language by the Commissioners on Practice and Pleadings in 1849 in their report to the Legislature, this provision, then subdivision 3 of section 264, and drafted by them, was merely "declaratory of the existing powers of the grand jury" (Proposed Code Crim. Pro. [1850], p. 131; emphasis supplied).
It is significant that this express power is in addition to the general power and "duty, to inquire into all crimes [as distinguished from misconduct] committed or triable in the county" *165 (emphasis supplied) (Code Crim. Pro., § 245), and of course a finding that a crime has been committed imposes upon the grand jury the duty to indict the one found to be the offender. Article 170 (§§ 1820-1877) of the Penal Law makes criminal various defined acts committed by a public officer. Therefore, section 253 would be meaningless unless it served some purpose other than section 245, and it seems to us that purpose is to continue to authorize the grand jury to investigate such matters and render a report for the information of the public embodying its conclusions after such an inquiry, as it has for centuries.
In Matter of Jones v. People (101 App. Div. 55, appeal dsmd. 181 N.Y. 389), decided in 1905, the only appellate authority in New York bearing directly on the question before us, a majority of the court affirmed the denial of a motion to set aside and quash a report censuring the Nassau County Board of Supervisors and two of its clerks for failure to properly perform their duties. After noting the power of inquiry conferred by section 260 (now § 253), the court stated (101 App. Div., at p. 57): "We may assume that these powers are conferred for some purpose. Official inquiry intends either official action or official report. As such powers are limited to inquiry, and the grand jury has no executive or administrative authority in the premises, the result of any inquiry must be report or statement which shall call attention to the wrong."
The majority noted that public officials were involved, and of course they are in a different situation from private individuals. They are servants of the public, and are subject to public criticism. Indeed, our Constitution recognizes the difference in the provision requiring public officials to waive immunity when called before grand juries under penalty of loss of their offices for refusal so to do (art I, § 6).
Moreover, the Legislature has indicated its belief that the grand jury possesses this reportorial power by passage, in 1946, of a bill which would expressly deny to a grand jury the power to make a "presentment or other public record censuring or reflecting upon the integrity of any person for alleged misconduct that does not constitute a crime" (see Matter of Lundy, 208 Misc. 833, 841). It was thus exercising a power which Delegate HALPERN in the 1938 Constitutional Convention recognized as within its province. Vetoing this bill, Governor Dewey in a vigorous memorandum stated: "The ancient power of grand *166 juries to inquire into the conduct of public offices and to make presentments concerning their findings has been one of the most valued and treasured restraints upon tyranny and corruption in public office."
Thus it is clear that the common-law right of a grand jury to submit a report for public information, on matters of public concern, imported into our Constitution, has never been abrogated by law. On the contrary, section 253 confirms that right.
The Justice at Trial Term was, therefore, in error when he suppressed the report upon the ground that there is no statutory authority, and that the grand jury went beyond its functions in "making" the report. He had no difficulty in disclosing the one paragraph in the report (with respect to a nonmandatory duty [§ 253, subd. (3)]) dealing with the county jail, notwithstanding the fact that this may well reflect upon the jail authorities or the public officials who make appropriations therefor. Why apply that standard to them, and refuse to apply the same standard to another agency of government (with respect to a mandatory duty imposed on the grand jury [§ 253, subd. (2)])? The mere fact that a governmental department may be criticized in a grand jury report where misconduct is found but cannot be pinpointed criminally to a specific individual is no ground for its suppression. Public officers, whether Presidents, Governors, Judges or other servants of the State, are not immunized from criticism, and it would be a sorry day for this country if they were.
We are mindful of the fact that as to policy vigorous arguments have been made on both sides. There are those who bitterly assail the practice, as did Mr. Ward in the Earl of Macclesfield case (supra) in 1684. There are others who hail it, as did Chief Justice VANDERBILT, as serving "a need that is not met by any other procedure. * * * No community desires to live a hairbreadth above the criminal level, which might well be the case if there were no official organ of public protest. Such presentments are a great deterrent to official wrongdoing" (In re Camden County Grand Jury, supra, at p. 66).
Nor are we unmindful of the fact that there may be some erring or misguided grand juries, but their reports may be treated as hereinafter indicated. These instances are uncommon, however, for, as the majority concede, they are "a judicial *167 body occupying a position of respect and importance in the community". The same concern was expressed in the Fourth Report of the Commission on the Code of Criminal Procedure (1849) with respect to indictments wrongfully obtained, and which placed a defendant's liberty in danger (pp. xxxiv et seq.); nevertheless we retain the indictment procedure. They recognized, however, that the grand jury system was "introduced among us in the same spirit in which it took its rise in the mother country", and that it "may be justly regarded, not merely as a safeguard to private right, but as an indispensable auxiliary to public justice". (Proposed Code Crim. Pro. [1850], supra, p. 116.)
The public, too, has rights. The grand jury is chosen from among them; they pay the expenses of grand jury investigations and, when dealing with matters of public concern, they are at least entitled to know the results of such investigations. Of course, the problem involves an accommodation of interests and, when we weigh them in the balance and find the practice here complained of has continued for so many years, we have no right to strike it down  that must be done by the people themselves directly, or through their duly elected representatives in the Legislature.
This is not to say, however, that any document submitted to a court by a grand jury must be filed as a public record. A grand jury is formed according to law (Code Crim. Pro., pt. IV, tit. IV, ch. II). They are required to take an oath to "diligently inquire and true presentment make, of all such matters and things as shall be given you in charge"; they "shall present no person from envy, hatred or malice"; and "shall present all things truly as they come to your knowledge" (Code Crim. Pro., §§ 239, 238). They are required to "receive none but legal evidence". If, therefore, upon presentation of a report the court find that it is based on evidence before them; that it deals with misconduct in public office; is not based on malice or otherwise violative of the grand jury oath; that no unwarranted accusations are made against an individual and it is not scandalous, it must permit the report to be filed as a public record.
The determination of the Trial Justice is, however, reviewable. However well intentioned he may be, he may err. He cannot be the sole arbiter of "what is useful and what might be *168 harmful", as the Appellate Division put it. Such power should never be given to a single individual, without his action being subject to review. Inasmuch as the Trial Justice has the power in the first instance to reject the proffered report as unacceptable for filing as a public record for any of the above reasons, and this determination is subject to judicial review, the argument of the majority that the report constitutes both the "first and last step of the judicial process" is not persuasive.
Accordingly, the order appealed from should be reversed, and the matter remitted to Trial Term for further proceedings not inconsistent with this opinion.
Order affirmed.
NOTES
[1] A grand jury report, although frequently referred to as a presentment, is essentially different. (See Dession and Cohen, The Inquisitorial Functions of Grand Juries, 41 Yale L. J. 687, 705-706.) A presentment  rarely used in this day  and an indictment are accusations of crime, the difference between them being that the former is made at the instance of the grand jury itself, while the latter is made at the instance of the public prosecutor. (See Hale v. Henkel, 201 U. S. 43, 60; Goebel and Naughton, Law Enforcement in Colonial New York [1944], pp. 351-355.) A report, on the other hand, is not intended to serve as a basis for prosecution. It is not a criminal accusation, grounded on legally sufficient evidence of the violation of a criminal statute, to which answer may be made in court; it is rather a moral condemnation or exhortation without any forum being provided for explanation or defense.
[2] A number of trial court judges have followed the Jones decision (see Matter of Quinn, 5 Misc 2d 466; Matter of Lundy, 208 Misc. 833; People v. "John Doe", 176 Misc. 943; Matter of Healy, 161 Misc. 582), but most of the lower courts which have written on the subject have espoused the contrary view. (See, e.g., Matter of Grand Jury [T. V. Quiz Program], 19 Misc 2d 682, 685-688 [per SCHWEITZER, J.], related case, Matter of Grand Jury Assn. v. Schweitzer, 11 A D 2d 761 [art. 78 proceeding]; Matter of Clay v. Wickens, 7 Misc 2d 84, 87-89; People v. McCabe, 148 Misc. 330; Matter of Funston, 133 Misc. 620; Matter of Crosby, 126 Misc. 250; Matter of Osborne, 68 Misc. 597; Matter of Gardiner, 31 Misc. 364. See, also, Federal Rules of Criminal Procedure, with Notes and Institute Proceedings [1946], pp. 250-251, per CRANE, Ch. J.; Medalie, Grand Jury Investigations, The Panel, Vol. 7, No. 1, p. 5.)

Most of the courts of the other jurisdictions which have considered the matter find the grand jury report both legally unauthorized and morally obnoxious. (See, e.g., Ex parte Robinson, 231 Ala. 503; Coons v. State, 191 Ind. 580; In Re Report of Grand Jury, 152 Md. 616; Bennett v. Stockwell, 197 Mich. 50; Bennett v. Kalamazoo Circuit Judge, 183 Mich. 200; State ex rel. Strong v. District Court, 216 Minn. 345; State v. Bramlett, 166 S. C. 323; Matter of Report of Grand Jury, 123 Utah 458; Matter of Report of Grand Jury, 204 Wis. 409; Matter of United Elec., Radio & Mach. Workers, 111 F.Supp. 858. See, contra, In Re: Report of Grand Jury, 152 Fla. 154; In re Camden County Grand Jury, 10 N. J. 23.)
[3] Whether the grand jury had the power at common law to file a report is a much mooted question. (See In Re Report of Grand Jury, 152 Md. 616, 619-623; In re Camden County Grand Jury, 10 N. J. 23, 34-64; Matter of Grand Jury [T. V. Quiz Program], 19 Misc 2d 682, 684, supra; see, also, Dession and Cohen, The Inquisitorial Functions of Grand Juries, 41 Yale L. J. 687; Kuh, The Grand Jury "Presentment": Foul Blow or Fair Play?, 55 Col. L. Rev. 1103; Note, 38 Col. L. Rev. 1493; Note, 44 Corn. L. Q. 257; Note, 74 Harv. L. Rev. 590.)
[4] In this connection, the court in the Osborne case (68 Misc. 597, supra) aptly observed (pp. 603-604): "It has become a custom of almost invariable occurrence that the grand jury, at the close of its term, makes a presentment on some subject on which, frequently, no evidence has been heard. This, no doubt, proceeds from the zeal of its members to promote the general welfare by calling attention to certain conditions which they believe should be remedied. So long as they are confined to matters of general interest they are regarded as harmless, even though a waste of time and effort, and after the ephemeral notice of the day has passed they are allowed a peaceful rest."