Henderson W. Morrison, J.
The April, 1975 Grand Jury designated as panel No. 4, through its forelady has submitted four Grand Jury reports to this court concerning four separate investigations. The reports shall, for identification purposes, be designated by this court as reports 1, 2, 3 and 4. All four reports were submitted pursuant to provisions of CPL 190.85 (subd 1, par [c]), and contain proposed recommendations for "legislative, executive and administrative action in the public interest based upon stated findings”. This court is now required to determine whether an order shall be made either accepting and filing such reports as public records, or directing that such reports be sealed. (CPL 190.85.)
Section 6 of article I of the New York State Constitution provides in part as follows: "The power of grand juries to inquire into the wilful misconduct in office of public officers, and to find indictments or to direct the filing of informations in connection with such inquiries, shall never be suspended or impaired by law.” While the District Attorney is by statute a legal adviser to the Grand Jury, he may not dominate or control them in the lawful exercise of their primary function of making inquiry. (United States v Rintelen, 235 F 787.)
The court has reviewed all of the stenographic transcripts of the Grand Jury minutes relating to these four reports. On November 21, 1975, the following took place in the Grand Jury room occupied by the April, 1975 Grand Jury panel No. 4:
A.D.A.: You can’t ask questions when the witness is in the room. Yes?
A JUROR: You don’t want to ask questions or not?
A.D.A.: It’s not permissible to ask questions when the witness is in the room. Didn’t they tell you that last week?
A JUROR: We ask questions all the time.
A.D.A.: You are permitted to ask questions of the witness but not while he’s in the room. There’s a new procedure that was instituted about a month ago where the Grand Jury is not permitted to ask questions when the witness is present in the room. That’s a directive by Mr. Dillon. It’s about a month old.
A JUROR: Nobody else has mentioned it.
A.D.A.: I can’t permit that. You can ask me the questions and I’ll determine *455 whether I should redirect it to the witness. Now, what’s the question?
ANOTHER JUROR: Well, I think we want to have a caucus then. We want to talk about this.
* * *
ANOTHER JUROR: I thought we had the right to ask questions of the witness.
A.D.A.: Not directly, no.
* * *
ANOTHER JUROR: Nobody else stopped us from asking questions.
* * *
ANOTHER JUROR: Let’s get in front of a judge, get a ruling from a judge.
ANOTHER JUROR: That’s right. You’re our legal advisor, I understand.
A.D.A.: Yes.
* * *
A.D.A.: I’m not going to get into an argument about it. There’s a directive by the District Attorney that’s about a month old and it states that the Grand Jury is not permitted to ask questions of a witness in the presence of a witness. Prior to my coming to Nassau County I’ve never experienced the Grand Jury directly asking questions of a witness. * * * Now, that’s a ruling that Mr. Dillon has made. Now, whether you know about it or you don’t, that’s what he said. Now, if [other A.D.A.’s have] done it, then it’s a different story. I’m not saying that’s the ruling and as far as I know that’s what’s done.
* * *
A.D.A.: This is a procedure that Mr..Dillon has determined, I believe, on the basis that he’s anticipating future legal problems arising by the fact that the Grand Jury is directly questioning a witness.
* * *
A.D.A.: All right. Since you’ve been asking questions we’ll continue doing it this way. However, I have to point out one thing. This is not an investigation. This is a presentation so I caution you that the questions you ask — you can ask any questions you want— but I caution you that since it is a presentation, that it’s presented to you in a straight forward manner, that the witnesses that are being brought before you are being asked questions by myself or [another A.D.A.] as an Assistant District Attorney, as your legal advisor. I can’t deny your request to ask questions directly. I do tell you, though, that Mr. *456 Dillon’s directive is the way it was explained to you before, but since you’ve been doing this this way, we’ll do it this way.
The directive discussed in the above excerpt is not before the court.
It may well be that the directive of the District Attorney and the instructions of his assistants relative to interrogation by grand jurors in the matter now before us were motivated by a concern for the rights of witnesses or as a precaution against unintentional grants of immunity or other legally improper areas of inquiry. Whatever the purpose, whatever the content of the directive, the effect of the discussion quoted above was to create a confused and inaccurate picture of the relationship between the Grand Jury and the District Attorney. This confusion was never subsequently corrected.
The relationship between the prosecutor and the Grand Jury in the context of "presentments” is an ancient one. At early common law the accusation of crime could be made either by a private accuser or by common repute. (1 Stephen, A History of the Criminal Law of England, pp 244-274.) In the latter method a representative of royal authority would summon local inhabitants to report from their own knowledge on breaches of the king’s peace. (1 Stephen, supra, pp 254-255; 1 Holdsworth, A History of English Law [7th ed, 1956], p 313.) This means of gathering local intelligence was also utilized for administrative purposes such as gathering data on individual wealth in order to tax it (The Domesday Book). (1 Stephen, supra, p 255; 1 Holdsworth, supra, p 313.) Not until the Sixteenth Century did it become the practice to supplement the private knowledge of the grand inquest with testimony. (4 Holdsworth, supra, p 528.)
The Grand Jury acted either in response to an official accusation or upon its own initiative. The former procedure led to an indictment or a finding of no true bill; the latter to a presentment. (Mack v People, 82 NY 235, 237; Matter of Wood v Hughes, 9 NY2d 144, 148.) It would appear that the Grand Jury report grew out of the presentment procedure where administrative action rather than criminal prosecution was recommended. (See Matter of Jones v People, 101 App Div 55; Matter of Osborne, 68 Misc 597.) The administrative or supervisory functions of the Grand Jury developed in an age when the various functions of Government remained undifferentiated. (10 Holdsworth, supra, p 151.) Remnants of feudalism imposed sometimes onerous duties upon petty hereditary office *457 holders whose services were furnished either gratuitously or in return for meager fees. (10 Holdsworth, supra, p 153.) Their discharge of these duties was supervised by the Grand Jury and nonfeasance or misfeasance led to indictment or presentment. (10 Holdsworth, supra, p 156.) Examining this institution in its historical setting, Holdsworth found that the Grand Jury as a supervisory body promoted Government accountability and democracy, but was an unreliable tool of administration ill-adapted to the complexities of Eighteenth Century England. (10 Holdsworth, supra, p 149.)
The first legislative act of the first colonial Assembly in the New York colony was to establish (in 1683) the grand inquest as the sole method of criminal accusation. (4 Lincoln, The Constitutional History of New York, p 69). Thus transplanted to the New World this medieval institution continued in its supervisory role. (Hamlin and Baker, Supreme Court of Judicature of the Province of New York, pp 152-154.) By 1850, however, its moral power was perceived to be waning and detailed legislation was recommended to define and limit the "vague and unlimited” powers of the Grand Jury. (Report to New York State Legislature of Commissioners on Practice and Pleadings on Code of Criminal Procedure [1850], pp 115-128.) The Code of Criminal Procedure which the Commissioners on Practice and Pleading recommended made no provision for Grand Jury action other than the accusation of crime. Almost 90 years later delegates to a constitutional convention wondered whether a Grand Jury had any power to issue reports. (Revised Record of Constitutional Convention of 1938, p 2572.)
Though lacking clear power to do so, Grand Juries continued to issue reports. Between 1900 and 1964 when section 253-a of the Code of Criminal Procedure, the predecessor of CPL 190.85, was enacted, every litigated case appears to have resulted in the partial or total quashing or expunging of a report save one. (Cf. Matter of Jones v People, 101 App Div 55, supra, with Matter of Gardiner, 31 Misc 364; Matter of Osborne, 68 Misc 597; Matter of Heffernan, 125 NYS 737; Matter of Crosby, 126 Misc 250; Matter of Funston, 133 Misc 620; People v McCabe, 148 Misc 330; Matter of Wilcox, 153 Misc 761; Matter of Healy, 161 Misc 582; Matter of Bar Assn. of Erie County [Hagerty] 182 Misc 529; Matter of Lundy, 208 Misc 833; Matter of Clay v Wickens, 7 Misc 2d 84; Matter of Third Sept., 1958 Grand Jury to submit and ñle Its Report Concerning Its Investigation of Certain Tel. Quiz Programs, 19 *458 Misc 2d 682.) The most common reason for suppression of a report has been that it criticized identifiable individuals. The rationale for suppression upon this ground was best expressed in People v McCabe (supra, pp 333-334): "A presentment is a foul blow. It wins the importance of a judicial document, yet it lacks the principal attributes — the right to answer and to appeal. It accuses but furnishes no forum for denial. No one knows upon what evidence the findings are based. An indictment may be challenged — even defeated. The presentment is immune. It is like the 'hit and run’ motorist. Before application can be made to suppress it, it is the subject of public gossip. The damage is done. The injury it may unjustly inflict may never be healed.” Also cited as a ground for suppression in McCabe was the effect a report might have upon pending prosecutions.
The judicial antipathy toward Grand Jury reports culminated in Matter of Wood v Hughes (9 NY2d 144, supra), wherein the court held that absent a clear legislative grant of authority, the Grand Jury had no power to issue reports critical of public officials but not alleging the commission of a crime. Judge Fuld, speaking for the majority, wrote as follows (pp 155-156):
"Grand jurors are not selected for their skill in appraising efficiency in public office or delving into matters more appropriately reserved for executive or legislative action. (See Matter of United Elec., Radio & Mach. Workers, 111 F. Supp. 858, 864-865, supra.) Moreover, the secrecy which necessarily surrounds the action of the grand jury prevents fruitful debate as to the merit of its charges, and the immunity which surrounds its members removes the normal restraint against recklessness. Under these circumstances, there is grave danger that grand jury reports may as readily be used as instruments of unfair partisan politics as of public enlightenment.
"It is indisputable that public officers be held to a high standard of performance. It is also indisputable that free and open criticism of the conduct of public office is part of the very lifeblood of our democracy. But these propositions are as irrelevant to the issue before us as they are unassailable. What is at issue here is not the integrity of a public official or his performance in office, but rather the process or procedure to be employed in charging and judging him. To be deplored, and avoided in the absence of a clear grant of legislative authority, is not public criticism of officials, but criticism *459 contained in a court report which, while it carries, at least, the aura of a judicial pronouncement, denies to the persons involved any of those safeguards designed to protect against the violation of cherished individual rights.”
In a strongly worded dissent, Chief Judge Desmond asserted that the power to report was an ancient attribute of the Grand Jury (Matter of Wood v Hughes, supra, p 158, citing Memorandum of March 31, 1946, Public Papers of Governor Dewey, pp 140-141).
In an avowed effort to reverse Matter of Wood v Hughes, Governor Rockefeller recommended the restoration of the power to report with appropriate safeguards to prevent abuse in his 1964 message to the Legislature. (McKinney’s Session Laws of 1964, p 1934.) The Legislature then enacted section 253-a of the Code of Criminal Procedure which became CPL 190.85. (Practice Commentary, McKinney’s Con Laws of NY, Book 11A, CPL 190.85, p 186.) In signing the measure into law Governor Rockefeller expressed the opinion that the restoration of this "ancient” power would provide a vehicle for bringing to light official misconduct. (McKinney’s Session Laws of 1964, p 1960.)
While section 253-a of the Code of Criminal Procedure was intended to reverse Matter of Wood v Hughes (supra), to the extent of re-establishing the Grand Jury’s power to report, its drafters were not oblivious to the criticisms voiced by the Court of Appeals. A forum was to be provided to anyone injured by a report and the right to appeal was afforded. Accusations and recommendations were to be based upon a preponderance of the credible and legal evidence. The Grand Jury was to make findings of fact to facilitate review. Adverse effects upon pending investigations was to be a grounds for at least temporary suppression and prior review was assured.
We noted earlier that in its early years the Grand Jury acted upon its own knowledge unaided by testimony. The use of witnesses gave the Government’s attorney a role in the Grand Jury procedure. "The grand jury sit by themselves and hear the witnesses one at a time, no one else being present except the solicitor for the prosecutor if he is admitted. ” (1 Stephen, supra, p 274; emphasis supplied.) The code recommended to the Legislature in 1850 contained the following provisions:
"§ 263. If a member of the grand jury know, or have reason to believe, that a public offense has been committed, which is *460 triable in the county, he must declare the same to his fellow jurors, who must thereupon investigate the same.
"§ 266. The grand jury may, at all reasonable times, ask the advice of the court, or of any member thereof, or of the district attorney of the county; but unless such advice be asked, neither of those officers are permitted to be present during the sessions of the grand jury; nor is any other person permitted to be present during their sessions, except the members of the grand jury, and a witness actually under examination.” (Report to New York Legislature of Commissioners on Practice and Pleadings on Code of Criminal Procedure [1850], supra, p 131.)
At least the former of these provisions was adopted substantially unchanged as part of the Code of Criminal Procedure. (Code Crim Pro, § 259, renumbered as Code Crim Pro, § 252.) Thus, Matter of Heffernan (125 NYS 737) concerned a report which resulted from investigation undertaken after a communication was received directly from a private individual by the Grand Jury without the intervention of the District Attorney. In Matter of Mullen v Block (176 Misc 442, 445), the court said: "True, the grand jury may call in to assist them the district attorney or his qualified assistants or the Attorney-General or his qualified assistants, or they may seek the advice of the court. But, on the other hand, the grand jurors are perfectly free, and it is their right, to investigate fully, without hindrance, any criminal charge which may be presented to them.” The Appellate Division, Second Department, has declared: "To the grand jury, and to it alone, is given the power of investigation without a definite charge.” (Matter of Booth, 200 App Div 423, 426.) Despite the substantial authority which supports Grand Jury autonomy (see, also, People v Stern, 3 NY2d 658; Matter of Prentice v Gulotta, 13 Misc 2d 280, 282), the Assistant District Attorney created the impression that the role of the Grand Jury was passive. Richard Kuh, in his germinal article The Grand Jury "Presentment”: Foul Blow or Fair Play (55 Col L Rev 1103, 1118-1119), argued that the value of Grand Jury reports as against the work of legislative committees and newspapers lay in the disinterest and independence of the Grand Jurors. Of what value, however, are the impressions of grand jurors, no matter how highly motivated, if they are made to wear blinders and led around with nose rings?
It is not sufficient to say that following this incident some *461 jurors continued to ask questions of witnesses. The fact remains that it is now impossible to determine to what extent some or all of the grand jurors were inhibited in the exercise of their prerogative and right to make inquiry. (NY Const, art I, § 6; CPL 190.05.) The Assistant District Attorney did not renounce his patently improper instructions but, on the contrary, suffered and permitted the Grand Jury to labor under the false impression that any questions asked by them directly of a witness, or while the witness was in the room, violated a legally authorized directive of the District Attorney and would only be tolerated by him since that was the way they had been previously proceeding. A request by one of the grand jurors to seek the advice of the court was ignored. It cannot be said that this Grand Jury was under these circumstances operating in an atmosphere conducive to open, fair, objective and independent inquiry. The directive or directives of the District Attorney referred to in the November 21, 1975 colloquy quoted above is not before the court in this proceeding. Regardless of its content or purpose, the construction given to it by the Assistant District Attorney to this Grand Jury clearly and unmistakably impinges upon their prerogative and right to ask questions and make fair inquiry of the witnesses —if need be, even outside of the presence of the District Attorney or his assistants. (CPL 190.25.)
The term of this panel finally ended with the March, 1976 term of this court. Nonetheless, an unavoidable and most serious question arises as to the extent to which this or these directives have been implemented by the Assistant District Attorneys presenting other matters to this or other Grand Juries sitting since the issuance of the directive or directives.
In order to avoid any recurrence of an incident of this nature with respect to any pending or future matter before any present or future panels of Grand Juries, this court has called together each of the panels of grand jurors now sitting in Nassau County, and has fully and explicitly reinstructed them as to the right of grand jurors to ask questions and to seek the advice of the court as well as the District Attorney as to the propriety or legality of any question they wish to ask. The Judges of this court have been requested to give similar instructions to future Grand Juries.
It should not be necessary to remind the District Attorney and his assistants that all instructions given to the Grand Jury with respect to their right to ask any questions or any *462 other legal matters affecting the Grand Jury proceeding must be made in the presence of and recorded by a Grand Jury reporter. (People v Percy, 45 AD2d 284, affd 38 NY2d 806; CPL 190.25, subd 6.)
When it becomes apparent that a grand juror has asked or is about to ask an improper or illegal question, the District Attorney may request and if the Grand Jury consents excuse a witness during the District Attorney’s instructions or explanation. Again, however, these must be recorded.
It might be further observed that not infrequently during these proceedings the Assistant District Attorney promptly discontinued questioning witnesses whose testimony did not support or tended to contradict the conclusions ultimately reached in these reports; on other occasions such witnesses were repeatedly reminded by the Assistant District Attorney of the significance of an oath or threatened with a charge of perjury or contempt.
It is impossible to determine what further inquiry may have been made by one or more of the grand jurors absent the pall of the District Attorney’s instructions inhibiting the asking of questions by the jurors. It is quite possible, however, to assume that the right to inquire became in the minds of the Grand Jury a privilege. The resulting action taken by the Grand Jury may well have been different.
The requirement of a preponderance of credible and legally admissible evidence before the release of a report is one of the safeguards built into the statute to avoid the abuses referred to in Matter of Wood v Hughes (9 NY2d 144, supra). (See, also, Kuh, The Grand Jury "Presentment”: Foul Blow or Fair Play?, 55 Col L Rev 1103, supra.) Whereas in these matters the Grand Jury has been discharged, the impanelling court is the final forum subject only to a limited right of appeal. No further evidence may be taken in determining whether the report should be released. (See Matter of First Report of Oct., 1972 Grand Jury, of Sup. Ct., Albany County, 44 AD2d 855.) In contrast, an indictment may be ultimately tested in a trial where all issues can be fully aired. Because of these differences, an indictment is presumed to be based on legal and sufficient evidence (People v Howell, 3 NY2d 672, 675), while a Grand Jury report may be sealed upon some indication that fair consideration of a matter has been tainted by prejudice. (Matter of South Mall Financing, 69 Misc 2d 460.)
The Grand Jury minutes furnished to this court failed to *463 disclose that this Grand Jury was ever given any instructions, legal or otherwise, by the District Attorney regarding the making of these or any Grand Jury reports. The record is barren of any reference by anyone as to the reports. Insofar as the minutes are concerned, the origin of the reports is a mystery. There is nothing on the record to indicate whether the Grand Jury requested the District Attorney to prepare these documents or whether the District Attorney submitted them to the Grand Jury for their consideration. It is inconceivable that the documents could have been prepared and produced without some communication between the District Attorney and the members of the Grand Jury, yet the transcripts shed absolutely no light upon this question. CPL 190.25 (subd 6) requires that legal instructions from the District Attorney be recorded in the minutes. (See People v Percy, 45 AD2d 284, affd 38 NY2d 806, supra, and American Bar Association Minimum Standards Relating to the Prosecution Function and the Defense function, § 3.5, recommending that every communication between the Grand Jury and the prosecutor be recorded.)
While it is true that neither a Grand Jury reporter nor the District Attorney nor anyone other than a grand juror may be present during the deliberations and vote of the Grand Jury, the Grand Jury was required to and did select one of their own members to act as secretary, whose duty it was to keep records material to the conduct of the Grand Jury’s business. (CPL 190.20, subd 3.) Among these records should be a recording not of the vote of any grand juror, but of the result of any vote taken as well as a certification that at least 12, with a quorum of at least 16 members present, voted in favor of the action taken. (CPL 190.25, subd 1.) Panel No. 4 was so instructed by the court at the outset of their duties in April, 1975. Neither in the transcripts of the minutes nor in any other document filed with this court is there the slightest record of such vital and essential information concerning these reports. The reports themselves contain merely the signatures of the forelady and the District Attorney, the latter being surplusage. District Attorneys are required to sign indictments (CPL 200.50, subd 9) but not reports.
The customary practice of filing a minute sheet signed by the secretary of the Grand Jury setting forth the existence of a quorum and the result of a vote of a Grand Jury was for some inexplicable reason not followed with respect to any of *464 these reports. (It might be noted that this Grand Jury was not oblivious of the practice of filing such a minute sheet signed by the secretary). (See, Matter of Haff, Nassau County Ct [April 7, 1976].)
The improper curtailment by the Assistant District Attorney of the Grand Jury’s right to inquire, as well as the failure to instruct the Grand Jury as to the making of a Grand Jury report gains added significance when considering the quantum of legally admissible evidence necessary for the publication of a report as contrasted to that required for the filing of an indictment. An indictment charging an offense is authorized when: (a) the evidence before the Grand Jury is legally sufficient to establish that such person committed such offense; and (b) competent and admissible evidence before it provides reasonable cause to believe that such person committed such offense. (CPL 190.65, subd 1.) A Grand Jury report may not be made public, however, unless the court is satisfied that it is supported by the "preponderance of credible and legally admissible evidence”. (CPL 190.85, subd 2, par [a]; emphasis supplied.)
While concededly Grand Jury proceedings are not adversary proceedings, the concept of a preponderance of credible and legally admissible evidence at very least implies an objective and fair presentation of the evidence, and that at least the Grand Jury not be prevented or curtailed from hearing contrary views or explanations of the conduct or activity they are about to criticize or seek to have changed.
This court must of necessity direct a sealing of these reports on the following grounds:
1. The prerogative of the grand jurors to make full and fair inquiry was impaired and inhibited by the improper instructions of the Assistant District Attorney and his failure to correct this error.
2. The absence of any record that a quorum of at least 16 grand jurors were present and that 12 grand jurors voted in favor of the reports. The Grand Jury reports cannot be considered as Grand Jury reports "to the court by which it was empanelled” as authorized by CPL 190.85 (subd 1) since no vote on their content and submission is found in the minutes of the Grand Jury. (Matter of January, 1967 Reports of Grand Jury of Sup. Ct., Cortland County, 52 Misc 2d 895.)
3. The absence of any record of any instructions given by the District Attorney as to the legal requirements for the *465 issuance of a report, or for that matter any record of communication between the District Attorney and the grand jury relative to the origin of the report which of necessity must have occurred.
4. Report No. 3 is not only not sustained by the preponderance of the evidence, but the findings in the report are in fact, in at least two instances, directly contradicted by the evidence. In the light of what has transpired before this Grand Jury, this court does not find that any of the reports were supported by a preponderance of credible or legally admissible evidence.
5. Were this court not sealing report No. 1 for above-stated reasons, the report would be sealed pursuant to CPL 190.85 (subd 4) in that the filing of such report as a public record may prejudice a fair consideration of pending criminal matters in Nassau County Court.
There is a further serious question as to whether or not this panel had authority to conduct the investigations represented by reports Nos. 1 and 3.
The original term for which this panel was created expired on May 5, 1975. The panel thereafter received 11 extensions of its term pursuant to CPL 190.15 upon the representation that the Grand Jury had not completed or was unable to complete certain business before it.
A Grand Jury may not consider matters which were not before it prior to the end of its original term. (Matter of McClure v County Ct. of County of Duchess, 41 AD2d 148; 1 Waxner, NY Crim Prac, Grand Juries, § 8.4; Pitler, Crim Prac Under the CPL, § 5.4, pp 222-223.) In a footnote in Matter of McClure (supra, p 151, n 2), the Appellate Division, Second Department, clearly indicated that the rationale for the restriction created by the enactment of CPL 190.15 was for the express purpose of preventing the continuance of "vest pocket” Grand Juries severely criticized by Judge Fuld in his dissent in People v Stern (3 NY2d 658, 665).
With respect to report No. 1 on May 2, 1975, three days before the last day of the original term of panel No. 4, it was developed in one and one-half pages of a witness’ testimony that he was conducting an investigation and that he had obtained a certain taped conversation among certain public employees. The tape was introduced into evidence. Nothing in the record indicates that this tape was heard by the witness or ever played or listened to by the grand jurors, and if played *466 the circumstances under which it was played, nor does the record in any way refer to its contents. No further evidence was elicited before the Grand Jury relative to this matter until December 5, 1975, during the seventh extension of its term to hear unfinished business presumably started in the original April, 1975 term.
With respect to report No. 3, again on May 2, 1975, the Grand Jury heard three pages of testimony from a witness who merely stated who he was investigating and what he was investigating, and that he was continuing the investigation. No further testimony was heard or evidence presented on the subject matter of report No. 3 until December 5, 1975. This was again during the seventh extension to hear unfinished business presumably started in the original April, 1975 term.
This court does not consider that which occurred on May 2, 1975, in either case a receipt of evidence sufficient to predicate eleven extensions of the term of the Grand Jury upon a claim of "unfinished business”. In this case other Grand Juries were available. To permit a District Attorney to engage in such practice would be tolerating a ruse designed to ¿void the salutory purpose of the statute, to wit: preventing the continuance of a "vest pocket”- Grand Jury.
Reports Nos. 2, 3 and 4 must be sealed also for failure to comply with CPL 190.85 (subd 2, par [b]). The report having been submitted pursuant to CPL 190.85 (subd 1, par [c]) (recommendations for legislative, executive or administrative action) must not be critical of an identifiable person or group of persons (Matter of Third Sept., 1958 Grand Jury to Submit and File Its Report Concerning Its Investigation of Certain Tel. Quiz Programs, 19 Misc 2d 682, supra).
The reports herein submitted criticize individuals who are clearly identifiable. They were expressly identified by name to the other witnesses appearing before this Grand Jury. These witnesses are not inhibited by the cloak of Grand Jury secrecy, and may themselves reveal such identity to whomsoever he or she pleases. The individual criticized cannot only be identified by anyone pursuing the matter, but a reading of articles in a daily newspaper in Nassau County in conjunction with these reports would immediately identify the individuals of whom the report is critical. Although the individuals have been divulged and criticized in the news media, to release these reports with the same or similar criticism would carry with it the aura of judicial pronouncement while depriving *467 the individuals of the safeguards enacted to protect their rights. (Matter of Wood v Hughes, 9 NY2d 144, supra.)
The language in Matter of January, 1967 Reports of Grand Jury of Sup. CL, Cortland County (52 Misc 2d 895, 897, supra) is applicable to the April, 1975 panel No. 4 of the Grand Jury: "There can be no doubt but that those members of the Grand Jury whose actions made this discussion and these decisions necessary were moved by pure motives and honest intentions. But this is not enough. A grand jury must meticulously observe those provisions of law which define and limit its powers and duties and the procedures it must follow. It did not do so here and this court is required to nullify the results of this failure.” (See, also, Matter of Findings and Recommendations of December 1969 Monroe County Grand Jury, 61 Misc 2d 735, 740.)
For the foregoing reasons, each of the reports will be ordered sealed.